## CIRCUIT COURT OF NORTHAMPTON COUNTY

Scott H. Saffold
and Detra R. Saffold

v.

Conway & Assoc., Inc.,
Timothy E. Nagle, President,
John D. Conway,
David Hopkins,
Timothy E. Nagle,
Maureen E. Meehan,
and Frances D. Conway

November 4, 2004

Case No. (Chancery) 03CH052

BY JUDGE GLEN A. TYLER

In this chancery suit for specific performance, the Court must decide whether the evidence presented upon trial of the cause, *ore tenus*, is sufficient to establish that one of four owners of a parcel of real estate had authority from the other three, as their agent, to bind them by a written sales agreement signed by the purported agent, and thus be sufficient to permit the Court to compel all four owners to convey the property to the purchasers.

The Bill of Complaint alleges, among other things, and the Answer of all Respondents admits, that a certain parcel of real property in Bay Creek subdivision in Cape Charles, which is the subject of this suit, is owned by deed dated December 3, 2002, in one-half undivided interest by Timothy E Nagle and Maureen E Meehan, husband and wife, as tenants by the entireties, and one-half undivided interest by John D. Conway and Frances D. Conway, husband and wife, as tenants by the entireties. The Bill further alleges that

180

Timothy E. Nagle signed written documents, including a "Virginia Association of Realtors Form Contract for Purchase of Unimproved Property," and an attached letter memorandum, accepting the offer of the Complainants, Scott H. Saffold and Detra R. Saffold, husband and wife, to purchase the property for the sum of $410,000. The Bill alleges that Nagle executed the documents for himself and as the authorized agent for the remaining three owners, binding them to convey. The allegation of agency is denied in the Answer of the Respondents creating the dispute in this litigation. The Complainants contend that they are ready, willing, and able to purchase, that the Respondents are bound to convey, that they have refused to do so, and are thus in breach of their agreement. Complainants sue to compel conveyance and for attorney's fees as allowed in the agreement.

The Bill of Complaint does not allege that the four owners of the subject property are members of a partnership or engaged in a joint venture with respect to the property.

The essential facts are uncomplicated. The owners of the property in question decided to sell their parcel of land and engaged the services of Paul G. Watson, III, of Watson Realty, as their real estate agent to find a buyer. Around the same time, the hopeful purchasers engaged the services of another real estate agent, Jon E. Paul of Parr Properties, to find a parcel of property for them. The two real estate agents learned of their mutual goals and communicated with one another, concluding that the sale and purchase was suitable. Watson provided inaccurate information to Paul about the names of the owners of the property, stating that they were "John Conway, David Hopkins, and Timothy Nagle." Paul, without further inquiry, used those names in writing the form offer dated July 22, 2003.

In response to the offer, Timothy Nagle sent a letter to Watson on the letterhead of Conway & Assoc., Inc., dated July 24, 2003, providing five additional terms and conditions to be included in the agreement. In the letter Nagle also stated "*we* will accept the offer. . . ." (Emphasis added.) Nagle did not comment specifically upon the inaccurate recitation in the written offer of the names of the owners. What he stated in his letter in that regard was, "Vesting is as follows [sic] Tim Nagel and Maurene Meehan 1/3; John and Frances Conway 1/3; Conway & Associates, Inc., a California corporation 1/3."[1] Nagle stated in testimony that the word "Vesting" was a word indicating ownership. However, it is obvious that, at the time he wrote the letter, he really meant that was how the sales proceeds were to be credited or distributed. He is bound to have known how the deed titled the property.

---

[1] The corporation is owned by Timothy Nagle and John Conway.

Nagle wrote further in the letter, "If it is acceptable (presumably, if the five terms and conditions are acceptable to the purchasers), *I* will annotate the offer to include the terms of this memo." (presumably, incorporate the five terms and conditions into the form agreement by writing or typing them in). (Emphasis added.) However, Nagle also wrote in the letter to Watson, "Please send all correspondence and/or documents to me which I will forward/circulate." In testimony Nagle interpreted this ambiguous language, specifically the word "circulate," to mean to get approval from the other owners, not just to inform them of what he was doing, since he at all times in his testimony denied his agency.

The final contract was the Realtors form agreement to which Nagle's letter of July 24 was attached as a part. Nagle had signed the letter and signed and dated each page of the agreement, including the signature page.

The Saffolds signed the form agreement and the attached letter, all together constituting the contract. Final signatures were secured on July 28, 2003. A signature line on the signature page of the form agreement, under which there were typed the names "John Conway, David Hopkins," contained no signature. Timothy Nagle signed on the signature line under which his name was typed. Nagle did not sign *for* anyone else. The names of the two wives appear nowhere in the agreement or attached letter.

In the form-language body of the agreement regarding deposit, the agreement stated in paragraph 4 "Purchaser has made a Deposit with Watson Realty (the Escrow Agent) of Ten Thousand Dollars. . . ." However, that had not actually happened. In explanation, the agreement included a typed-in provision stating "The deposit referenced in paragraph 4 herein shall be delivered to Watson Realty no later than five business days from acceptance and ratification of this contract." That was because the purchasers' money was being held by an intermediary, contemplating an Internal Revenue Code § 1031 like-kind exchange.

Eleven days after the contract was finally signed by Nagle and the purchasers, on August 8, 2003, an attorney representing the purchasers, Robert C. Oliver, Jr., wrote Watson telling him that he, Oliver, had the Saffold's $10,000 deposit available to be picked up. Then, he wrote in his letter "Please have the remaining owners sign the contract as Mr. Nagle agreed that they would."

The next day, August 9, 2003, Nagle sent a letter to Watson. Contrary to Nagle's testimony at trial, this letter compels the obvious conclusion that Nagle was not confused, as he claimed, about the two provisions in the contract regarding the deposit. The purpose of the August 9th letter is found in Nagle's statement therein to Watson that "If the buyer does not complete their

[sic] specific obligations under the agreement (e.g. delivery of the down payment), you have *our* authorization to cancel the agreement. . . ." (Emphasis added.) Furthermore, contrary to Nagle's testimony, it is indeed inescapable that he must have believed that there had been "acceptance and ratification" of the agreement and that the window regarding delivery of the deposit had remained open for five and more days and that there was already a binding agreement subject to being cancelled.

On August 11, 2003, the realtor, Jon Paul, hand-delivered a letter and the $10,000 deposit by cashier's check to Watson, who rejected it on behalf of Nagle.[2] As a result, a meeting was arranged for August 13, 2003, among Nagle, Watson, and Robert Oliver (an attorney who has practiced real estate law in Northampton County for 35 years). Oliver testified that, upon his again asking Nagle to have the other three owners sign the contract, Nagle told Oliver he could speak for the others. Nagle denied it in testimony, even in the face of Oliver's contemporaneous written memorandum of Nagle's statement to him.

On August 22, 2003, Paul sent a letter to C. Albert Turner, III, attorney for Nagle, advising of the Saffolds' compliance with the financing contingency in the agreement and of the removal of all other purchaser contingencies. On August 26, 2003, Turner responded by letter to Oliver to advise that Nagle "does not view the . . . contract as binding. . . ." and that "the owners . . . were entitled to conclude that, when the deposit was not timely made, there was no binding contract" and "Nagel does not agree that he made any representations that he was an agent for the other owners."

The fat was in the fire.

The Court will first review the general rules of agency as they apply in circumstances where there is no express authority for the purported agent, Timothy Nagle, to bind the purported principals, Maureen Meehan, John Conway, and Frances Conway. There is credible evidence from the alleged agent, as the foregoing review of the testimony and documents in this case discloses, that the alleged agent by words and actions appeared to be an agent for the other three owners authorized to sell, if not convey, their real property. But from what source must the evidence come in order to prove that an alleged principal has clothed an alleged agent with authority to execute a binding contract for the sale of real estate?

We can eliminate the creation of agency by estoppel. In order for the doctrine of estoppel to apply (to prevent the putative principal from pleading

---

[2] The lateness of the deposit was not pleaded or argued as a grounds of defense by the Respondents.

lack of authority), there must be words, actions, or failures to speak or act by the principal which are misleading or which the principal should know are misleading, causing the person dealing with the agent to act to his detriment. There is no evidence here that any of the three principals said or did anything misleading.

Probably the owners did authorize Timothy Nagle to conduct all the business affairs and sign all the documents necessary to consummate an agreement to sell their real estate. But Robert Oliver, possibly clairvoyant, recognized the difficulties surrounding proof in such cases. In order to establish apparent agency, the burden of proof is upon the party dealing with the agent to establish the agency by clear and convincing evidence. *Hartzell Fan, Inc. v. Waco, Inc.*, 256 Va. 294 (1998). A purchaser dealing with an agent authorized to sell land must inquire into the extent of the agent's authority and deal with the agent at his peril. *Payne v. Jennings*, 144 Va. 126 (1926).

The general rule of agency is that authority in the agent is created by written or spoken words of the principal or by conduct of the principal. And apparent authority is created as to third persons by the same words and conduct of the principal that the principal consents to the acts of the agent on the principal's behalf. Restatement (Second) of Agency, §§ 26, 27 (1958). An agent has no apparent authority to a stranger who does not know of the reputation or past conduct of the agent. Restatement (Second) of Agency, § 27, cmt. 6 (1958).

The intention of a principal and an agent to create the fiduciary relationship of agency must find expression either in words or conduct between them. The existence of the relationship is a fact to be proved by tracing it to some act of the alleged principal. 3 Am. Jur. 2d, *Agency*, § 15 (2002). An implied agency may be proved by deductions or inferences from the facts and circumstances of the case, provided there is a natural and reasonable construction of the facts and circumstances. *Id.* at § 16. The party asserting agency must demonstrate that the principal, by his conduct, caused the party to believe that the alleged agent was indeed an agent for the principal. 3 Am. Jur. 2d, *Agency*, § 342 (2002). There is no presumption of agency. And the relation of husband and wife does not raise a presumption of agency. *Id.* at § 343.

Actually, the extrajudicial statements of the alleged agent are not admissible to prove the fact of the agency. They were admitted, nevertheless, but their weight is suspect for that particular purpose. A purported agent cannot unilaterally create an apparent agency through his own words or conduct. 3 Am. Jur. 2d, *Agency*, § 347 (2002). When from extrinsic evidence

a prima facie case of agency is made out, then the agent's declarations and statements become competent. *Royal Indemnity Co. v. Hook,* 155 Va. 956 (1930). There must be other competent evidence establishing the fact of agency other than the declarations, acts, or conduct of the agent, or the declarations, acts, and conduct of the agent must be of such a character as to justify an inference that the principal knew of them and would not have permitted them if unauthorized. *Bardach v. Charleston Port Terminals,* 143 Va. 656, 657 (1925). The authority disclosed by the declarations, actions, and conduct of a principal must be sufficient to prove clearly and convincingly not just that the agent had authority to negotiate and communicate for the principal, but that the agent had authority to actually sign a sales contract for the principal. *Walson v. Walson,* 37 Va. App. 208 (2001).

In *Morris v. Mosby,* 227 Va. 517 (1984), there were spoken words, significant relationships, and substantial conduct of the principal, John Morris, illustrating the existence of an agency. Importantly, John Morris, the principal, was at all times during the transaction aware of the agent's actions and that such actions were inescapably those of an agent acting on his behalf. The most important fact was that John Morris knew the real estate agent was going to prepare the agreement in final form and return to John's office with it but John knew only his son, Richard, would be there to sign it and that expeditious action was crucial.

This Court must conclude, sadly for the innocent Saffolds, that there is not in this case evidence from the necessary source, the alleged principals, sufficient to prove clearly and convincingly that Timothy Nagle was their agent authorized to execute a real estate sales contract on their behalf. The Bill of Complaint will be dismissed.